(No. 11365.—Reversed and remanded.)

T. B. McGovern *et al.* Appellants, *vs.* Stephen A. D. Mc-Govern *et al.* Appellees.

*Opinion filed December 19, 1917—Rehearing denied Feb. 6, 1918.*

1. Wills—*when decree dismissing bill to set aside deeds is not res judicata.* A decree dismissing a bill to set aside certain deeds, which is affirmed upon the express ground that the deeds, which had been confirmed by will, could not be set aside unless the will was also set aside in the same proceeding, is not *res judicata* of the right of the complainants to maintain a suit to set aside the will and the deeds in one proceeding.

2. Same—*what tends to corroborate testimony that the testator lacked mental capacity.* Evidence of a conversation between the testator and his attorney at the time of the execution of a codicil to his will indicating that the testator had left the business wholly in the hands of the attorney and was merely acquiescing in what his attorney suggested, tends to corroborate the testimony of other witnesses that the testator did not at that time have sufficient mental capacity to make a will, notwithstanding the attorney testifies that in his opinion the testator was competent.

3. Same—*when verdict as to testator's mental capacity will be set aside.* Where it is apparent from a careful consideration of the whole record, after giving the testimony of witnesses for the proponents the full credit to which it is entitled, that the verdict of the jury that the testator had sufficient mental capacity to make a will is palpably against the weight of the evidence, the verdict will be set aside on appeal.

4. Same—*when witness should be permitted to express opinion as to mental capacity of testator.* A witness who has testified as to his long acquaintance with the testator, although he testifies to but one circumstance that he had noticed was unusual or peculiar in the testator's actions, should be permitted to give an opinion as to the testator's mental capacity.

Craig, J., took no part.

Appeal from the Circuit Court of Knox county; the Hon. Harry M. Waggoner, Judge, presiding.

R. D. Robinson, Williams, Lawrence, Welsh & Green, John B. Brown, and J. E. Maley, for appellants.

282 — 7

Hardy & Hardy, Roy M. Marsh, Armour Moreland, and Carney, Carney & Nelson, for appellees.

Mr. Justice Cooke delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Knox county dismissing for want of equity a bill filed to set aside the last will and testament of James McGovern, deceased, and to set aside two deeds executed by him in his lifetime.

James McGovern died at his home in Galesburg, Illinois, on July 15, 1913, leaving surviving him Terrence B. McGovern, Ella Greason and Julia Cavanaugh, complainants in the bill and appellants, and Stephen A. D. McGovern, Mary A. Lahey, Joseph E. McGovern and James W. McGovern, his children, and Frank, James and Edward Dunn and Mamie Markey, his grandchildren, as his only heirs-at-law, and also as the only legatees and devisees mentioned in his purported last will and testament. The testator resided in Knox county for more than fifty years. From 1902 until the time of his death he resided in the city of Galesburg. Prior to that time he resided on his farm near the villages of Oneida and Wataga. His daughter Ella resided with him until she was about fifty years of age. We are unable to find from the record the date of the death of the second wife of the testator, but it appears that for many years, and until the year 1912, the daughter Ella, who was then unmarried, lived with him and managed the home. Prior to the execution of the deeds which will be hereinafter noted, and, as appellants contend, at the time of his death, the testator owned 327 acres of land in Knox county, Illinois, and 240 acres of land in Polk county, Iowa. He also owned the property upon which he resided in Galesburg and considerable personal property. On May 24, 1910, he executed the will in question, by which he devised to his son Stephen 127 acres, to his daughter Mary 110 acres and to his son James W. the remainder of the Knox county

lands. He directed that 80 acres of the Iowa land be sold by his executors and that $4000 of the proceeds derived therefrom be paid to his daughter Julia. To his daughter Ella he devised 80 acres of the Iowa land and to his son Joseph he devised the remainder of the Iowa land. To his son Terrence he bequeathed a note for $4000 which Terrence owed him, and the sum of $1000. He directed that the homestead property in the city of Galesburg be sold, and made bequests to the Dunn children, one of whom was Mamie Markey. Stephen and Mary were named as executors to execute the will in the State of Illinois, and Joseph and James W. were named as executors to execute the will in the State of Iowa. In January, 1912, he executed deeds conveying all his farm lands to Stephen, Mary, Joseph, James W. and Ella, and on the same day executed a codicil to his will. Within a few days afterward, according to the testimony of his attorney, these deeds and codicil were burned under the direction of the testator. On July 27, 1912, the testator executed what is now referred to as the first codicil to his will. This codicil simply revoked a codicil not now in existence. On August 26, 1912, he executed four deeds. By one of them he conveyed to Stephen, for the expressed consideration of $7000, 200 acres of the Knox county lands; by another he conveyed to Mary, for the consideration of $2000, the remainder of the Knox county farm; by another he conveyed to Joseph, for the consideration of $3000, 120 acres of the Iowa land; and by another he conveyed to Elizabeth McGovern, the wife of James W., the remainder of the Iowa land. Two days later, on August 28, 1912, he executed the last codicil to his will. In this codicil he recites that he has disposed of all his real estate, except his homestead in Galesburg, to his children Mary, Stephen, Joseph and James, and ratifies and confirms the deeds of conveyance so made. He directs that his homestead in Galesburg be sold at public sale, and that the proceeds, together with his personal property, be equally

divided among his heirs then living, after paying $1000 to each of the four Dunn children, who are also to participate in the residue. By this codicil Mary and Stephen were made executors.

On July 16, 1913, appellants filed their bill in the circuit court of Knox county to set aside the four deeds above mentioned on the ground of the mental incapacity of the grantor and because of the exercise upon him of undue influence. Upon a hearing this bill was dismissed for want of equity. On appeal to this court that decree was affirmed upon the express ground that heirs-at-law cannot maintain a bill to set aside deeds of their ancestor upon the ground of mental incapacity and the exercise of undue influence where no attempt is made to set aside a will of the ancestor which by a codicil executed two days after the deeds were made expressly ratifies the deeds, as in such case the setting aside of the will is essential to the determination of the interest of complainants in the land. (*Mc-Govern* v. *McGovern*, 268 Ill. 135.) The bill in this case was filed on July 27, 1914, and after the decision in *Mc-Govern* v. *McGovern*, *supra*, it was amended by seeking to have the deeds executed to Stephen and Mary set aside on the ground of mental incapacity and the exercise of undue influence, which were the same charges made in the original bill asking to have the will and the codicils set aside. Appellees answered that part of the bill by which it was sought to have the will and codicil set aside and pleaded the decree in the former case of *McGovern* v. *McGovern*, *supra*, as a bar to the relief prayed for in that portion of the amended bill which sought to have the two deeds set aside. This plea was set down for argument and was held to be good and a bar to that portion of the relief sought. An issue of fact was then made up on that portion of the amended bill which sought to set aside the will and the two codicils, and the cause was submitted to a jury, which found the writings to be the last will and testament, and codicils

thereto, of James McGovern. A decree was entered accordingly and this appeal perfected.

It is first contended that the court erred in holding that the former proceedings which resulted in the decision in *McGovern* v. *McGovern, supra,* are *res judicata* of the matters upon which relief was sought in that portion of the bill asking to have the two deeds set aside. It is immaterial upon what ground the trial court entered the decree dismissing the bill to set aside the deeds. In *McGovern* v. *McGovern, supra,* we held that appellants were not entitled to litigate the question of the mental capacity of the grantor in those deeds or of the exercise of undue influence upon him in a separate suit attacking the validity of the deeds alone, in view of the fact that by another writing which it was claimed was executed two days later the grantor expressly ratified and confirmed the execution of the deeds. In that case we declined to discuss the question of the validity of the deeds and left the same open in case appellants should see fit to proceed along the lines indicated in the opinion. The court erred in holding that the decree in the suit to set aside the deeds was *res judicata* of any matter sought to be put in issue in this case.

There was no evidence that the execution of the will, codicils and deeds had been procured by the exercise of undue influence, and the court did not err in withdrawing that issue from the jury.

The chief ground relied upon for reversal is, that the verdict of the jury and decree of the court are palpably against the weight of the evidence. The evidence includes the testimony of more than one hundred witnesses and is very voluminous. As it would serve no good purpose to discuss the testimony given by each witness in detail, we will not attempt to do more, except in a few instances, than state the general purport and effect of the testimony.

The testator, when a young man, immigrated to the United States from Ireland, and some years thereafter, in

1857, located on a farm in Knox county. He afterward removed to a farm near the village of Oneida, where he remained until 1902, when he abandoned his farming operations and moved to the city of Galesburg. At the time of his death he was eighty-six years of age. During the time he was actively engaged in business he is shown to have been industrious and a man of considerable business sagacity. By his thrift and industry he accumulated a considerable amount of property and was regarded as a man of strong mind and firm convictions. In addition to his farming operations he superintended the operation of a coal mine on his farm. In the conduct of his farming and coal mining operations he frequently had business in the small villages of Oneida and Wataga and was personally acquainted with the people who lived there. He had a relative, Mrs. Margaret Coleman, residing in Oneida, whom he visited frequently. His son Terrence also resided in Oneida, and he was in the habit of visiting frequently at his home. He was a Roman Catholic, and during the time he resided upon the farm was a member of the Catholic church in Wataga. He attended regularly the religious services conducted at that church while he resided on the farm. When he removed to Galesburg he purchased property at the corner of Prairie and South streets, which he occupied as his homestead until the time of his death. This property was situated immediately across Prairie street, west from Corpus Christi Roman Catholic Church. After moving to Galesburg he was a regular attendant of Corpus Christi church until he died. This church building is an imposing structure, and by reason of its height is visible at a great distance. So far as the record discloses the testator enjoyed his usual health for the first few years after moving to Galesburg and there was apparently no change in his mental condition.

Dr. William H. Maley, a physician residing in Galesburg, was called to attend the testator during the early part

of the year 1909 and attended him from that time until he died. He was first called to treat him for some bowel trouble, but he found, among other things, that the testator was afflicted with a cancer on the inside of the lip, near and in the rear of the right corner of the mouth. He also found him to be afflicted with arterio sclerosis. Dr. Maley testified that these diseases are progressive and that they did progress from that time until his death. According to the testimony of this physician the mental condition of the testator was poor in 1909 and continued to grow worse. The cancer progressed both in size and virulence, until in the last two or three years of testator's life it produced a copious discharge of an offensive and poisonous substance which drooled from his mouth or was swallowed into the stomach. According to the opinion of Dr. Maley the absorption of this substance into the system, through the stomach and otherwise, produced a toxic condition which materially affected the mentality of the testator. The disease known as arterio sclerosis also progressed and in the opinion of the witness affected his mental condition. Dr. Maley testified to many hallucinations of the testator during the time he treated him and many acts which strongly indicated a deranged mind. He testified that from the time he was first called, in 1909, he was frequently summoned to the home of the testator during the night time and invariably found him in bed fully dressed, with his shoes or boots on; that the testator told him there was a factory near his home where cancers were manufactured and shipped all over the country, and that this factory was shipping cancers to him and intended to get him; that he frequently found him searching for his cancer, which he claimed he had lost in the sink or bath-tub or elsewhere about the house; that although there was a toilet in the house and easily accessible from the testator's room, he was in the habit of urinating in the cuspidor and in the bath-tub; that when the doctor was summoned in the night the testator would insist

that if he would give him some medicine he could be relieved of his pain, and that when the medicine was furnished he would refuse to take it. Dr. Maley detailed many hallucinations which the testator had, and stated that this condition existed during practically the whole of the time that he treated him. He gave it as his opinion that the testator's mind was affected from the first time he was called to treat him until his death, and that during the years 1910, 1911, 1912 and 1913 he was of unsound mind and did not have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty. In September, 1910, the testator called upon Dr. A. F. Stewart, in Oneida, with reference to the growth in his mouth. Dr. Stewart described it as being then about the size of a hazel-nut. Acting upon the advice of Dr. Stewart the testator went with him on that day to Galesburg for a consultation with other doctors in the office of Dr. William O'R. Bradley. Dr. Bradley testified that the cancer at that time was about the size of a silver dollar, and in this he was substantially corroborated by Dr. Clyde A. Finley. It was the judgment of the medical men who examined him on this occasion that the cancer must have been in existence for two or three years. Dr. Stewart expressed no opinion as to the mental condition of the testator, but Dr. Bradley and Dr. Finley were of the opinion that at the time of this examination the testator was mentally sound. The testimony of Dr. G. E. Luster, now deceased, given in the former suit to set aside the deeds, was read in evidence on the part of appellees. During the months of October and November, 1912, Dr. Luster made a number of professional calls at the testator's home in attending some member of Mrs. Lahey's family. He saw the testator, observed him and talked with him on each of these occasions but declined to express any opinion as to his mental condition. This, briefly, is the substance of the medical testimony.

A large number of persons who had known the testator for many years, and also a great many people who lived near him in the city of Galesburg, testified to his mental condition. During the fifty years he had lived in Knox county he was quite familiar with the city of Galesburg, yet, according to the evidence, on innumerable occasions he was found bewildered and lost on the main streets of the city during the last five or six years of his life. In 1906 or 1907 he was found lost at the corner of Simmons and Prairie streets, two blocks from his home. In 1907 he was found lost at the corner of Seminary and Main streets, five blocks from his home, and at First and Liberty streets, ten blocks from his home, in the vicinity of the home of a friend whom he was in the habit of visiting frequently. In 1909, and again in 1912, he was found lost at Prairie and Thompkins streets, one block from his home. Two or three years before he died he was found lost and bewildered at the corner of Main and Prairie streets, three blocks from his home. On this occasion he was standing just across Prairie street from the Galesburg National Bank, where, according to the proof, he transacted all his banking business in the city of Galesburg. On each of these occasions he was directed to his home, and in most instances those directing him regarded it as necessary to observe him as he went, in order to see that he did not become bewildered again. A neighbor woman who lived one block east of the testator's home testified that in 1911 or 1912 she found him lost and bewildered in front of her house. She directed him to his home and he went away. In about fifteen minutes he returned and again told her he was lost. She went part of the way with him west along South street, and after she left him she watched him and saw him go on past his own home. About two weeks after that time she again had the same experience. The janitor at the court house, which is located on the first block west from the home of the testator, testified that in 1911 he saw him wandering around

the court house yard and upon accosting him found that he was lost; that he directed him how to reach his home, a block away; that the testator left him and apparently walked around the court house and again approached him and told him he was lost; that he went part of the way home with him, called his attention to the Catholic church and directed him where to go; that he watched him and observed that when he had gone but a short distance he accosted a woman on the street and apparently asked her to direct him to his home; that a short time afterwards he again found him wandering about the court house yard and again learned that he was lost; that he took him south across the court house yard to South street, where he hailed the driver of a grocery delivery wagon and asked him to take the testator to his home, one block east. The driver of the wagon also testified to the same circumstance, and further, that when he took the testator to his home, and after he had helped him from the wagon, his daughter came out of the house and took him in. These are some of the many instances testified to where the testator, from 1907 to the time of his death, was lost in the immediate vicinity of his home and in the community with which he had been familiar for many years.

Otto F. Walter lived on the same side of Prairie street and in the same block with the testator. In 1912 the testator came around the house and upon the side porch of Walter's home one evening and remained there, walking back and forth. Walter opened the door and asked him what he wanted, and he replied by asking if Walter's house was the Catholic church. Walter told him where he was and then led the old gentleman across the street to the door of the church. Mrs. Walter testified to the same circumstance. Other witnesses testified to the fact that he was unable to find his way unaided from his home across the street to the church, or from the church back to his home, during the last few years of his life.

George Babb lived next door to the testator from 1908 and knew him from the time he moved there. Mrs. Babb and her daughter both testified that in 1910 the testator walked into their home, sat down and asked for his daughter, thinking he was in his own home. R. L. Prentiss, who lived in the same block, also testified that in 1912 the testator mistook the Prentiss home for his own. C. M. Webster, a negro minister who lived in the center of the block across South street from the home of the testator, testified that in 1912 the testator came to his door thinking he was at his own home; that he opened the door and explained to the testator that that was not his home and pointed out his home to him; that while he was talking to him, Mrs. Banks, a neighbor, came up and took him by the arm and led him home, and that he had seen Mrs. Banks lead him home in this way on two or three other occasions.

Residents of Oneida and Wataga testified that on a number of occasions during the last two or three years of his life the testator was lost on the streets of those villages. On one occasion, on the streets of Oneida, he inquired of A. B. Anderson where his relative, Mrs. Coleman, lived, and was unable to find the place until directed there by Anderson. William Arnold, a barber residing in Oneida, found him lost and bewildered on the streets of that village in 1910 or 1911. Upon learning from him that he desired to go to the home of his son Terrence he took him there, and when he came to the house he pointed it out to the testator and told him that was where his son lived. His son's wife came out and explained to him that was where they lived and led him into the house. Another witness, a merchant in Oneida, also testified that in the spring of 1911, at the testator's request, he directed him to the home of his son Terrence. Evidence to the same effect was given that during the same period he was frequently lost in Wataga.

A number of persons with whom the testator had been acquainted for many years testified that he repeatedly failed

to recognize them. Margaret Phillips, a school teacher who lived in Galesburg and had visited in the McGovern home both while the family lived on the farm and after they moved to Galesburg, testified that he failed to recognize her during the years 1910, 1911 and 1912. His next door neighbor, George Babb, who saw him frequently from 1908 to 1912, testified that during the latter part of this time the testator never recognized him and did not know who he was when he met him; that on one occasion in 1910 or 1911 he saw the testator in his garden and spoke to him, and that testator demanded that he remove a pile of manure from testator's barn, stating that if the manure was left there it would burn his barn. In the conversation Babb learned that he had mistaken him for John Cheneler, a fruit dealer, who up until a short time previously had rented the barn from him. He explained to him that he was mistaken and told him who he was but was unable to make him understand that he was not the person he had taken him for. He still continued to demand that Babb remove the manure. The washerwoman who came to the home regularly for the family washing testified that on frequent occasions the testator did not know her and she could not make him understand who she was. Many of his old neighbors and acquaintances at Oneida testified that from 1909 until the time of his death testator did not recognize them and that they were unable to make him understand who they were. One witness testified that she was in the habit of staying with the McGovern family over Sunday during the last seven or eight years of his lifetime and that during the greater part of this time he did not recognize her or know who she was. A number of witnesses who had known testator for many years testified to the same effect.

The matron of the Chicago, Burlington and Quincy railroad depot at Galesburg, who was a member of Corpus Christi church and had known the testator and his family intimately for years, testified that from the year 1908 until

1912 she saw the testator frequently in the waiting room of the depot; that her duties were to look after women, children and old men who needed attention. She testified that the testator came to the depot frequently when he apparently had no mission there; that she would ask him if he was looking for someone or if he wanted to go to Oneida; that he would tell her he was looking for someone or that he expected to leave on a certain train; that he wandered around aimlessly and in a bewildered manner and apparently had no fixed idea of what he wanted to do, and that on many occasions she went out on the platform where he was standing or walking and took him into the waiting room and told him to sit down and explained to him that he must wait and not go out on the platform, where he might be hurt; that she frequently directed him to his home, two blocks away; that on some of these occasions he would leave in a different direction than the one pointed out to him, and many times he would return to the waiting room of the station in a few minutes. Without going further into her testimony in detail, it appears that on these occasions she cared for him and watched over him as she might have cared for and watched over a little child, and that he paid no heed to her suggestions and warnings of danger. She testified that frequently his daughter would come to the station looking for him, and that instead of him having business there it would develop that he had simply wandered away from home. The testimony of this witness, extending over the time that it did and detailing the frequent experiences she had with him, tends strongly to show that during that time the testator's mentality had become seriously weakened.

Margaret Phillips also testified to the hallucinations referred to by Dr. Maley. She stated that about two years before his death she called at his home and was sitting in the yard visiting with his daughter when he came to the door and said that he had had that sore on his face; that

it had gotten away from him, and he wanted them to come and get it for him. He also stated that the cancer had gotten away and was up on the ceiling and he could not get it. Adele Maley and Mrs. John E. Maley testified that in 1911, when they were in Corpus Christi church saying their prayers, they observed the testator there; that he seemed bewildered and was wandering around looking into the pews and under the seats; that he disturbed them, and finally Mrs. Maley, thinking he was looking for his hat and cane, picked them up and handed them to him, and that he kept on peering into the pews and mumbling that he had lost his cancer and could not find it.

We have not attempted to detail all the circumstances indicating the loss of mental powers testified to by the various witnesses called on behalf of appellants but have only given the general scope of that testimony. All the witnesses who testified to these circumstances who were permitted to give an opinion expressed the opinion that the testator was of unsound mind during all these years and was not competent to transact the ordinary affairs of life. These witnesses were all disinterested, and many of them had had the most favorable opportunities for observing him intimately and often.

The only fact appearing anywhere in the record which could be urged as a reason for any discrimination on the part of the testator among his children is, that in 1912 his son Terrence made application to the county court of Knox county to have a conservator appointed for his father. Those proceedings were not pressed but were dismissed. They were instituted before the execution of the last codicil and the deeds in question. If the testator had sufficient mental capacity to appreciate the purpose of those proceedings this might have afforded a good reason for his desire to discriminate against Terrence. Nothing whatever appears in the record to show why he should discriminate against his daughter Mrs. Greason, who had spent practically the whole

of her life in his service and who had kept the home for him and waited upon him for so many years. It is true that witnesses testified to statements made by the testator in which he charged Mrs.· Greason with having procured her brother Terrence to bring the action in the county court for the appointment of a conservator, but it does not appear from the record anywhere that Mrs. Greason had anything to do with instituting those proceedings. It was shown that during the time Mrs. Greason lived with her father he gave her notes aggregating $2000 for her services. In the light of the contract made with Mrs. Lahey the appellees cannot with any assurance insist that this was ample compensation. When Mrs. Greason left, in 1912, Mrs. Lahey came to the testator's home to take care of him under a written contract whereby she was to receive the sum of $10 per week and the use of the residence, furnished, for her family.

Appellees produced a great number of witnesses, among whom were persons who had known the testator for many years, who had seen and conversed with him during the last five or six years of his life, and who gave it as their opinion that up until the time of his death he was of sound mind and competent to transact business. It is impossible to reconcile the testimony given on behalf of appellants with that given by some of appellees' witnesses, which, standing alone, would amply support the verdict.

The attorney who drew the will, codicils and deeds in question had been the testator's attorney for many years and testified in great detail to many business transactions with him and also to his knowledge of him through their social relations, which were intimate. He expressed the opinion that the testator was always of sound mind and memory.

· Many of the witnesses for appellees did not have the same opportunity for observation that the near neighbors and close friends of the testator had, who saw him almost every day and who were able to detect any peculiarities that

existed. The cross-examination of other of appellees' witnesses discloses that circumstances existed which were significant but which were apparently unnoticed by them.

When the deeds and codicils were executed, in January, 1912, in the office of the testator's attorney, they were executed in the presence of Rev. John Phelan. Father Phelan was the president of Corpus Christi College, a school connected with Corpus Christi church, and frequently officiated at that church, where he met the testator at least once a week. He testified that the testator came to him on the day the deeds and codicil were executed and asked him to go with him to the office of his attorney where he wanted to revise some deeds, and he wanted the presence of Father Phelan to give him some security. Father Phelan testified that when they arrived at the attorney's office the deeds were produced and read by the attorney; that the testator at different times during the reading of the deeds suggested that he wanted to leave certain property to "so and so," and on each occasion the attorney pointed out to him that the provision had been made. After the deeds had been read, according to this witness, the attorney reminded the testator that he had between $20,000 and $30,000 in money and securities which had not been disposed of and that no disposition had been made of his homestead in Galesburg. The testator then asked Father Phelan to act as conservator or executor of the homestead and sell it after his death and distribute the proceeds equally among the members of his family. Father Phelan testified that he declined to do this, and that another paper was then prepared by the attorney and executed by the testator which provided for the disposition of the personal property and homestead. This undoubtedly was the codicil referred to by the attorney as having been executed on that occasion and later destroyed. After the business had been transacted Father Phelan took the testator to his home. Father Phelan expressed the opin-

ion that at that time the testator was of sound mind and memory and possessed the capacity to transact business. The fact that he desired someone to go with him to give him a feeling of security, the fact that it did not occur to the testator until his attorney reminded him that he had between $20,000 and $30,000 in money and securities to dispose of, and the fact that it did not occur to the testator that he had not disposed of his homestead property in Galesburg until it was suggested to him, apparently did not impress the witness as being at all peculiar or unusual.

The codicil of August 28, 1912, was executed at the residence of the testator and was attested by Mary Mangion, (the stenographer employed by testator's attorney,) Julia Cothren and Rica McKinley. These were the only persons present at the time the codicil was executed and attested, except the testator's attorney. Miss Mangion and Miss Cothren were the only ones of the attesting witnesses called to testify, and each of them expressed the opinion that at the time the last codicil was executed the testator was of sound mind and memory. On cross-examination Miss Mangion testified that the testator's attorney asked him "if he wanted us ladies to sign his will;" that the testator replied, "Just as you say; just as you say;" and that the attorney then responded, "Not as I say, Mr. McGovern, but as you say." Miss Cothren testified that she waited at the home an hour before the attorney came and that the testator did not come into the room until they were ready to transact the business; that before the testator signed the codicil his attorney asked him if it was according to his wishes, and he replied, "Just as you say," and that he was then speaking to his attorney; that the attorney replied, "It is not as I say but as you say," and the testator then bowed his head and said "it was as he wished it, or something like that;" that after that the testator signed the codicil and it was witnessed by the three young ladies. This witness declared

282 — 8

that she had detailed everything the testator said while he was in the room, and that immediately after the codicil was signed and attested the testator left the room and the attorney picked up the codicil and left the house with it. Whether the version of Miss Mangion or that of Miss Cothren is correct as to what stage of the proceedings had been reached when the statement of the testator, "Just as you say," was made is largely immaterial. It indicates that the testator was leaving the conduct of the business, if he understood it at all, wholly in the hands of his attorney, and this testimony corroborates and substantiates the testimony of witnesses on the part of appellants that the testator did not have sufficient mental capacity to comprehend the extent of his property and to realize who the natural objects of his bounty were or to transact the business in which he was then engaged.

Appellees attempted to show that the testator transacted business up until the time of his death, and contend here that the record shows that he personally transacted his business. They also call attention to the fact that a large number of checks drawn on the Galesburg National Bank, where the testator transacted his banking business, were promptly honored and paid during each of the years in question.

Mary Shea had for sixteen years been the book-keeper and cashier at the M. J. Buckley grocery store, where the testator's family had traded for eleven or twelve years. She expressed the opinion that the testator was of sound mind and competent to transact business, basing it upon her experience with him in his dealings at the grocery store. She testified that she never had any conversation with him while he traded there and that she never knew him to make any purchases there himself; that the groceries for his family were purchased there, and that testator regularly paid the bill, when rendered, by his personal check, and that he came to the store and paid the bills and took receipts. It

developed upon her cross-examination that when these pay-
ments were made the testator came into the store with either
the book in which the grocery firm kept his account or with
a statement of the account which had been mailed to him
and with a check already filled out and signed; that if he
came with the book the check was inclosed in the book, and
if he came with the statement the check was fastened to it;
that he simply presented the bill and check to her and she
made out a receipt and gave it to him and then gave him a
treat of candy or cigars. On one occasion before she had
time to write out the receipt he asked her for his treat.
She further testified that on at least one occasion when he
came into the store she heard him ask one of the clerks
there where Buckley's store was. This clerk was called as
a witness on the part of appellants and stated that on more
than half a dozen occasions the testator came into the store
and asked him if that was Buckley's store or where Buck-
ley's store was. It does not appear from the testimony of
either of these witnesses that he ever transacted any other
business at the store than that detailed. It does appear
from the evidence and by stipulation that the testator did
not fill out the body of any of the checks offered in evi-
dence but simply signed them. When he made the payments
at Buckley's grocery he brought in a check that was already
filled out and signed, and did no more than present the check
and wait for his treat and the receipt.

A drug clerk testified that for two or three years be-
fore the testator's death he frequently made sales to him of
Duffy's Malt Whisky and that he always paid for it in cash.
On cross-examination it developed that on at least one of
these occasions he was accompanied by his son Stephen, and
on other occasions he was accompanied by one of his daugh-
ters. It does not appear from the testimony of this witness
that he ever made a sale to the testator when he was not
accompanied by one of his family.

Both of the members of the clothing firm of Farrell & Mears were called to testify to the fact that in 1912 the testator had purchased a pair of trousers at their store and that in about sixty days afterward he returned them, claiming that they had not given satisfaction, and that his money was refunded to him. It developed upon the cross-examination of Farrell that the testator's daughter was with him when the trousers were purchased and that she brought him to the store when they were returned.

The fruit dealer who rented the testator's barn for six or seven years prior to 1910 or 1911 testified that he paid him the rent each month and that sometimes the testator called at the fruit store for the money. At what times during the rental period he called for the money, and whether he was accompanied on those occasions by any of his children, does not appear. This witness also testified that the testator called at the fruit store after the termination of the rental period and demanded that the manure which had accumulated be removed from the premises.

A clerk in a dry goods store testified that for two or three years before the testator's death he called at that store and made purchases from him on an average of about every two or three weeks. He could not remember any article that he had sold him and could not remember the name of any other person making purchases during the same time. A coal dealer was called to testify to his transactions with the testator in selling and delivering him coal and to a dispute which he had over the correctness of a bill which had been rendered. On cross-examination it developed that this man had transacted all his business with either Mrs. Greason or Mrs. Lahey, or both, and that the testator took no part in the transaction of the business whatever. A fire insurance agent was called to show that he had transacted business with the testator up until the year 1910, but it developed that this man had never transacted any business with the testator personally since 1903. Miss Mangion, who

was employed as a stenographer in the office of testator's attorney at the time the will of May 24, 1910, and the various codicils thereto, and the several deeds testified to, were executed, testified that the testator never came to the office of his attorney alone but was always accompanied by some member of his family, except on the one occasion when he came with Father Phelan, and that the person who came with him waited for him and took him home.

It was also shown that on December 17, 1912, the testator had loaned to S. R. Parkinson and E. P. Robson, of Wataga, $5000, for which he took their note and gave them his check on the Galesburg National Bank, which check was honored and paid at that bank. Parkinson testified that he was vice-president and E. P. Robson was president of the bank at Wataga; that he had known McGovern for forty years; that a day or two before this loan was made someone had sent for him to come to Galesburg to see the testator. He did not know whether the testator, his attorney, his son Stephen or someone else sent for him, or whether he had been summoned by letter, telephone or telegraph. He stated that he went to the testator's home and the testator told him he wanted to lend him $5000. It does not appear that either Parkinson or Robson had been seeking a loan. He testified that he asked the testator if he wanted him to give a mortgage; that he said no, he wanted a note, only, and he wanted him and E. P. Robson to sign it; that he agreed to take the loan and returned on the 17th of December and completed the deal. The note was drawn up on a form used by the Wataga bank, was executed in Wataga by Parkinson and Robson, and Parkinson testified that he brought the note with him when he came to Galesburg on the 17th of December, and Robson testified that he signed the note at the bank in Wataga before Parkinson took it to Galesburg. Parkinson did not know in whose handwriting the body of the note was. He testified that he was not familiar with the handwriting of his son, who

had been cashier of the Wataga bank for six years, or with the handwriting of Robson, the president of the bank, and did not know whether the body of the note was in the handwriting of either of them. The testator's attorney testified that he went to the home of the testator on the morning of December 17 and while there he wrote out the body of the note which was identified by Parkinson and offered in evidence, and also wrote out the body of the check for $5000 on the Galesburg National Bank which the testator was to sign, and that he left before the transaction was completed and before the check was signed. Parkinson testified that three or four checks were spoiled by the testator when he was attempting to sign them, by the secretions which dripped from his cancer. Both Parkinson and the testator's attorney testified at great length as to this transaction. Their testimony is utterly irreconcilable, and the only fair deduction that can be drawn from their joint account of what occurred is, that the testator had no part in the whole transaction further than to sign his name to the check when he was directed to do so.

Appellees point out that during all these years a large number of checks executed by the testator were promptly honored and paid at the Galesburg National Bank, where he transacted his banking business. No officer or employee of this bank was called to testify. It does not appear that during the period it is claimed the testator was mentally unsound he was ever in the bank or ever transacted any business with anyone connected with the bank. If he ever made a deposit of money there the record does not disclose it, or at least counsel have not pointed out the fact. Neither does it appear that he ever went personally to the bank and withdrew any money. The only evidence of his dealings with the bank is, that when a check was drawn to pay some bill for the family expenses or the like by his daughter or some other member of the family, the testator

executed it when he was requested to do so and the bank honored it and paid it.

We are not unmindful of the fact that the jury saw the witnesses and heard them testify, and that the court, who also saw the witnesses and heard them testify, refused to set aside the verdict and entered a decree dismissing the bill; but it is apparent from a careful consideration of the whole record, after giving the testimony of the witnesses for the appellees the full credit to which it is entitled, that the verdict of the jury is palpably against the weight of the evidence and that the court erred in not setting it aside and granting a new trial.

The only other ground urged for reversal is the action of the court in not allowing the witness A. B. Anderson, the banker at Oneida, to express an opinion as to the mental condition of the testator. Anderson testified to his long acquaintance with the testator, but testified to only one circumstance that was unusual or peculiar that he noticed, and that was when the testator asked him where Mrs. Coleman lived. Anderson knew that the testator was well acquainted in Oneida and that he had known where Mrs. Coleman lived and had visited there frequently. This was a slight circumstance and still one that was significant. The court should have allowed the witness to give an opinion in view of his long years of acquaintance, together with this experience as a basis.

For the reasons given the decree of the circuit court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. Justice Craig took no part in the decision of this case.